Jeffrey STEPHENS, Appellant,

v.

PARIS CLEANERS, INC., T/D/B/A Paris Uniform Rental and Supply, Gasbarre Product, Inc., T/D/B/A Sinterite, Inc.; Perfect Uniform & Sportswear, Ltd.; Red Kap Industries, an Affiliate of Blue Bell, Inc.; William–Dickie Manufacturing Company S–N & W Industries, Inc.; and Penngraph Division T/D/B/A Toyo Tanso USA, Inc.

Superior Court of Pennsylvania.

Submitted Jan. 24, 2005.

Filed Sept. 9, 2005.

Reargument Denied Nov. 10, 2005.

---

Brian D. Cox, Pittsburgh, for appellant.

Jesse L. Pleet, Wyomissing, for Red Kap, appellee.

John B. Fessler, Erie, for Gasbarre, appellee.

Troy J. Harper, Brookville, for Paris Cleaners, appellee.

Robert A. Arcovio, Pittsburgh, for Williamson–Dickie, appellee.

BEFORE: FORD ELLIOTT, TODD, and OLSZEWSKI, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 This distressing case comes before us as a consequence of the trial court's granting all remaining defendants' motions for summary judgment. We affirm.

¶ 2 On March 25, 1998, Jeffrey Stephens ("employee"), who had been employed by Penngraph, Inc. ("Penngraph") for approximately six weeks, sustained burns over 74 percent of his body when a graphitizer on which he was working exploded. Penngraph is a manufacturer of bulk carbon and graphite materials that are used in electric discharge machining. To produce the graphite materials, Penngraph utilized seven graphitizers. The entire process involved placing the product in a first bake oven, a second bake oven, and then the graphitizer. During the graphitizer stage, the carbon was first heated to and held at a desired temperature at a firing station and then allowed to cool down for several hours, after which the graphitizer was physically moved to a cooling station.

¶ 3 Of critical importance during the transfer process is maintaining water flow through the water-cooled nitrogen feed through, which is welded to the base of the graphitizer, to prevent water from getting into the graphitizer's furnace, where the temperature reaches approximately 4,000 F. As Ken Alt, employee's supervisor, explained, allowing water to infiltrate the furnace at such a high temperature would be "like putting pure oxygen to a fire." (Kenneth Alt deposition transcript ("Alt deposition"), 10/03/03 at 78, R. at Exhibit C, Appendix to Gasbarre's Brief in Support of Motion for Summary Judgment, 12/12/03, R. at 122.) The result would be an enormous increase in pressure inside the graphitizer as a result of unvented gases.

¶ 4  To allow for uninterrupted water flow, Joseph Weinkauf, the Penngraph engineer who designed the feed through, equipped it with duplicate sets of connections so the feed and return hoses supplying water at the cooling station could be connected to the graphitizer before moving it from the firing station, located four to six feet away.  Once the cooling station hoses were connected, the valves at the cooling station could then be opened prior to closing the valves at the firing station, after which the firing station hoses would be disconnected.  The graphitizer could then safely be moved from the firing to the cooling station.  (Joseph Weinkauf deposition transcript ("Weinkauf deposition"), 6/18/02 at 15, 45–49, R. at Exhibit B, Appendix to Gasbarre's Brief in Support of Motion for Summary Judgment, 12/12/03, R. at 122.)

¶ 5  The incident this case involves occurred while employee and Alt were in the process of transferring graphitizer number 4 from the firing station to the cooling station.  Employee was positioned on a catwalk approximately two feet above the graphitizer when flames shot out of the top of the graphitizer, igniting employee's polyester blend uniform, which melted onto his skin.

¶ 6  Employee filed a complaint sounding in strict liability against Paris Cleaners t/d/b/a Paris Uniform Rental and Supply ("Paris"), the company that supplied work uniforms to Penngraph employees; Gasbarre Products Inc. t/d/b/a Sinterite, Inc., ("Gasbarre"), the company employee alleged supplied the component part of the graphitizer that failed, causing the explosion; Red Kap Industries ("Red Kap") and Williamson–Dickie Manufacturing Co. ("Williamson–Dickie"), two of the companies that manufactured uniforms Paris supplied to Penngraph; and Penngraph.  Employee also brought counts sounding in

negligence against Paris; Gasbarre; Perfect Uniform & Sportswear, Ltd., ("Perfect"), another uniform manufacturer Paris used; Red Kap; Williamson–Dickie; and Penngraph.  Employee's final claim was a breach of warranty count against Gasbarre.

¶ 7  Following extensive discovery, including deposing the parties or their representatives, each of the defendants filed motions for summary judgment.  The trial court, the Honorable John Henry Foradora, President Judge, granted the motions by order entered June 15, 2004 and this timely appeal followed, in which employee raises the following issues:

A.  Whether the Judge committed an error of law in finding that [employee] failed to produce sufficient evidence to show that the clothing in question was manufactured by either Red Kap or Williamson–Dickie when it had an affidavit from [employee] confirming that Red Kap manufactured his pants and shirt and Williamson[-]Dickie manufactured his coveralls?

B.  Whether the Judge committed an error of law in finding that the at-issue clothing was not defective despite the expert report provided by [employee] that indicated the clothing was defective due to failure to warn of its dangerous propensities?

C.  Whether the Judge committed an error of law in finding that defendant Paris Cleaners did not owe [employee] a duty to provide uniforms that were safe and appropriate for his workplace?

D.  Whether the Judge committed an error of law in finding that [employee] failed to produce sufficient evidence that Gasbarre manufactured the water cooled nitrogen feed through when the plaintiff had pro-

vided evidence that such a feed through was manufactured and sold to Penngraph just before the at issue graphitizer furnace was rebuilt with a new feed through?

E. Whether the Judge committed an error of law in finding that Gasbarre had no duty to [employee] to ascertain the use of the product?

F. Whether the Judge committed an error of law in finding that Penngraph did not rely upon Gasbarre's skill in furnishing a suitable feed through despite contrary evidence?

Appellant's brief at 4.

¶ 8 " 'A reviewing court may disturb the order of the trial court [on appeal from a grant of summary judgment] only where it is established that the court committed an error of law or abused its discretion.' " *Downey v. Crozer–Chester Medical Center*, 817 A.2d 517, 524 (Pa.Super.2003), *appeal denied*, 577 Pa. 672, 842 A.2d 406 (2004), quoting *Murphy v. Duquesne University Of The Holy Ghost*, 565 Pa. 571, 590, 777 A.2d 418, 429 (2001) (citation omitted). " 'As with all questions of law, our review is plenary.' " *Id.*, quoting *Murphy, supra* at 590, 777 A.2d at 429 (citation omitted).

'In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C[iv].P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof .... establishes the entitlement of the moving party to judgment as a matter of law." [W]e will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.'

*Id.*, quoting *Murphy, supra* at 590, 777 A.2d at 429 (other citations and quotations omitted).

¶ 9 While employee presents six issues for our review, we find that our resolution of issues A and C disposes of issue B, and that we can address issues D, E, and F together.

¶ 10 In his first issue, employee claims the affidavit he swore to, naming Red Kap as the manufacturer of his shirt and pants and Williamson–Dickie as the manufacturer of his coveralls, precluded the trial court from entering summary judgment as to those two defendants. In the context of a products liability action, before liability will attach, "plaintiff must establish that the injuries sustained were caused by the product of a particular manufacturer or supplier." *Payton v. Pennsylvania Sling Co.*, 710 A.2d 1221, 1225–1226 (Pa.Super.1998), citing *Burman v. Golay and Co., Inc.*, 420 Pa.Super. 209, 616 A.2d 657, 659 (1992). "[I]n cases in which the allegedly defective product is not available, a plaintiff may prove identification through circumstantial evidence." *Id.* at 1224, citing *O'Donnell v. Big Yank, Inc.*, 696 A.2d 846, 849 (Pa.Super.1997). The quantum of identification evidence a plaintiff must offer prior to trial in order to justify allowing the issue to be submitted to a jury is factual and, thus, case-specific. *Id.*, citing *O'Donnell*, 696 A.2d at 849.

¶ 11 In this case, it was undisputed that Penngraph provided the uniforms for its employees; Paris supplied the uniforms to

Penngraph; and Red Kap, Williamson–Dickie, and Perfect Uniform manufactured some or all of the uniforms Paris supplied to Penngraph. Employee testified during his deposition, taken April 18, 2002, that the shirt, pants, and coveralls he was wearing the day of the accident were completely incinerated and therefore unidentifiable; therefore, he provided his attorney with a list of all of the names he recalled ever seeing on his uniforms. (Transcript, Jeffrey Stephens' deposition ("Stephens deposition"), 4/18/02 at 66, Exhibit to Red Kap's Motion for Summary Judgment, 12/11/03, R. at 118.) Employee also testified that some of the uniform parts he received were new and some used, and that some of the shirts had long sleeves while others had short sleeves. (*Id.* at 83–84, 89.)

¶ 12 However, when employee was asked, "Do you know which uniform you put on that day, whether it was a new one or a used one?", employee responded, "No, I can't remember." (*Id.* at 84.) When employee was asked, "And the shirt you were wearing on the day of the explosion, was that a short-sleeve or long-sleeve shirt?", employee answered, "I had a mixture of both of them, but I can't recall if it was long or short." (*Id.* at 89.) Finally, when employee was asked, "Can you describe what emblems you recall seeing in your pants, your uniform pants?", employee replied, "I never really looked at them. I can't really describe them to you. I never looked at them in detail." (*Id.* at 90–91.)

¶ 13 On February 11, 2004, however, employee filed an affidavit in response to the various motions for summary judgment. In that affidavit, employee averred that after his deposition, he conducted research in the form of viewing the uniform manufacturers' catalogs and internet sites so that he could refresh his recollection.

(Affidavit of Jeffrey Stephens ("Stephens affidavit"), 2/11/04, R. at 135.) As a result, employee swore he could identify Red Kap as the manufacturer of his shirt and pants and Williamson–Dickie as the manufacturer of his coveralls. (*Id.*)

¶ 14 The trial court struck and disregarded the affidavit, however, opining:

> [Employee] provides no cognizable basis for the discrepancy [between his deposition testimony and the affidavit] except that he indicates that he had since conducted research into the identity of the uniform that provided the basis for his recollection. This is also in direct contradiction to his deposition testimony on page 84 where he stated that he did not specifically look at or notice any tags that would identify where the uniform came from or the manufacturer. In addition, this Affidavit was filed after the Defendants' Motions for Summary Judgment and amidst almost certain demise of [employee's] case.

> Courts have concluded that allowing such offsetting Affidavits that contradict prior deposition testimony would effectively eviscerate summary judgment motions, rendering them useless . . . .

> In addition, Pa.R.C[iv].P. 1035.4 provides in part:

>> Supporting and opposing Affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the signer is competent to testify to the matters stated therein . . . .

> The affidavit provided by [employee] was not made on personal knowledge, but rather, was based on information gle[a]ned from outside sources including product catalogs, visits to suppliers and the internet. Further, the Affidavit contains statements of opinion regarding

the manufacturers of the clothing worn on the day in question and not facts. Trial court opinion, 8/16/04 at 2–3 (citation omitted).

¶ 15 We find support for the trial court's decision in *Lucera v. Johns–Manville Corp.,* 354 Pa.Super. 520, 512 A.2d 661 (1986). In *Lucera,* Lucera was diagnosed with asbestosis in 1972 after filing a disability claim for his asbestos-related injury. On cross-examination at trial, Lucera read into the record the following excerpt from the 1972 disability form, under the block number asking for "Cause of Injury," in which Lucera stated, " 'I have been exposed to asbestos material which I work with at Philadelphia Naval Shipyard.' " *Lucera,* 512 A.2d at 666, quoting disability form. Lucera also testified that he first became aware he had the beginnings of asbestosis in 1972 but claimed he was not aware his injury was caused by the conduct of another party until 1975–1976. *Id.*

¶ 16 After trial, in answer to a motion for summary judgment, Lucera attached an affidavit stating that he did not know in 1971 or 1972 that his asbestosis was caused by the conduct of another party.[1] *Id.* In granting GAF's motion for summary judgment, the trial court opined, " 'The affidavit … strains the chords of credibility, as it appears to totally contradict [Lucera's] testimony at the non-jury trial.' " *Id.* at 667, quoting trial court opinion. This court found no abuse of discretion in disregarding the affidavit and granting GAF's motion for summary judgment because Lucera's affidavit was not "wholly credible." *Id.,* citing *Taylor v. Tukanowicz,* 290 Pa.Super. 581, 435 A.2d 181 (1981). *Accord, Gruenwald v. Advanced Computer Applications, Inc.,* 730 A.2d 1004, 1009 (Pa.Super.1999) (opining that a trial court may disregard an affidavit, sworn in response to a motion for summary judgment, when it directly contradicts a fact, such as the minutes of a meeting, and the court therefore finds it not wholly credible).

¶ 17 In this case, the trial court did not find employee's affidavit wholly credible based upon his prior deposition testimony. As a result, the court opined:

> Absent the Affidavit, [employee] produced no evidence to indicate that either Defendant Red Kap or Defendant Williamson–Dickie manufactured the clothing worn by [employee] on the date in question. Since proof of causation is a necessary element of a plaintiff's *prima facie* case in a products liability action as well as in a negligence action, and [employee] was unable to produce evidence of such causation, it is this Court's opinion that Summary Judgment was warranted as to the Defendant's Red Kap and Williamson–Dickie.

Trial court opinion, 8/16/04 at 3. We find no error of law or abuse of discretion and therefore no merit to employee's first issue.

¶ 18 In employee's second issue, he argues that the trial court erred when it found the clothing employee was wearing at the time of the explosion was not defective for purposes of his products liability claims against Red Kap and Williamson–

---

1. The court dismissed GAF's first motion for summary judgment because it failed to comply with a case management order. The case went to trial, non-jury, and the court dismissed the case as untimely based upon the applicable statute of limitations. Lucera filed an appeal for a new, jury trial, an appropriate procedure at that time, and GAF filed a second motion for summary judgment; hence the trial testimony was available before GAF filed, or the trial court decided, the motion for summary judgment at issue on appeal. *Lucera,* 512 A.2d at 662.

Dickie.[2] *See Riley v. Warren Mfg. Co.,* 455 Pa.Super. 384, 688 A.2d 221, 224 (1997) (citing the Restatement (Second) of Torts § 402A (1965) for the proposition that in order to prevail on a products liability claim, the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm). We find this issue moot as we have already determined the trial court did not err when it concluded that employee produced no evidence to indicate that either Red Kap or Williamson–Dickie manufactured the clothing worn by employee on the date in question, thereby failing to establish proof of causation.

¶ 19 In his third issue, employee claims the court committed an error of law by finding that Paris did not owe employee a duty to provide uniforms that were safe and appropriate for his workplace. Employee bases his argument on the deposition of Paris' Chief Financial Officer, Jason McCoy, who testified that Paris holds itself out as an expert in the field of uniform supply and normally visits a customer's work site, meeting with staff people and potential uniform wearers to determine the appropriate uniform for the customer's employees, which Paris then recommends. (Deposition transcript, Jason McCoy ("McCoy transcript"), 4/18/02 at 21–22, 74), (Exhibit B to Paris' Motion for Summary Judgment, 12/12/03, R. at 124.)

¶ 20 While employee acknowledges that the contract between Penngraph and Paris did not obligate Paris "to make any specific recommendations for uniforms, perform any safety studies, or assume any obligation for supplying PPE to Penngraph employees[,]" employee argues nonetheless that by holding itself out as an expert in the field of uniform supply, Paris assumed a duty to employee.[3] (Employee's brief at 15; Rental Agreement between Paris and Penngraph ("Rental Agreement"), 1/23/96, Exhibit B to Paris' Motion for Summary Judgment, 12/12/03, R. at 124.)

¶ 21 McCoy testified, however, that while some customers had no idea what they wanted and relied extensively on Paris' recommendations, other customers "know exactly what they want and their needs are and request that." (McCoy transcript at 30–31.) McCoy also testified that nothing in the records he was able to find and review indicated that Penngraph "either did or didn't have an idea what they wanted." (*Id.* at 31.) Additionally, McCoy stated Paris had no written policy for a salesperson to follow before recommending a particular uniform. (*Id.* at 97.) McCoy, who was the only Paris employee whose deposition was taken, further testified that he personally never dealt directly with Penngraph and could therefore base his testimony solely on Paris' customary practices and the few records that remained regarding Penngraph's account with Paris. (*Id.* at 24, 32–34, 47–48.)

¶ 22 The task of determining the existence of a duty for purposes of assigning liability in a negligence action is for the court, not the jury. *See Kenner v. Kappa Alpha Psi Fraternity, Inc.,* 808 A.2d 178, 182 (Pa.Super.2002) (observing, "In *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166 (2000), our Supreme Court enunciated several factors that our courts are to balance in determining whether a party owes another a duty[.]"),

---

2. The trial court addresses this issue with regard to Paris as well as with regard to Red Kap and Williamson–Dickie; however, on appeal, employee does not raise or argue the issue with regard to Paris.

3. "PPE" is a term used in the Occupational Safety and Health Act to refer to personal protective equipment.

*appeal denied,* 575 Pa. 697, 836 A.2d 122 (2003). Thus, the question of duty is a question of law for the trial court to decide, not a question of fact for the jury, and is therefore a proper basis for summary judgment.

■ ¶ 23 In determining the existence of a duty, the *Althaus* court enunciated the following factors for the court to consider: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus, supra* at 553, 756 A.2d at 1169 (citations omitted).

¶ 24 In this case, the contract between Paris and Penngraph did not mention any obligation on Paris' part to recommend uniforms, and the record is devoid of any evidence either that Penngraph requested or Paris offered such recommendations. Employee nonetheless relies upon a report prepared by Ronald N. Thaman for FTI/SEA Consulting at employee's request. (Accident Evaluation, Penngraph, Inc., prepared by FTI/SEA Consulting ("FTI/SEA report"), 8/12/03, Exhibit to Red Kap's Motion for Summary Judgment, 12/11/03, R. at 118.) In that report, Thaman opined to a reasonable degree of scientific certainty that Paris "assumed the responsibility of providing required PPE at Penngraph." (*Id.* at 1.) Thaman also indicated that "Penngraph did rely on the expertise of Paris [ ] for the selection of proper protective clothing for its employees. Paris [ ] stated that, 'it would always find out what types of work are done so Paris [ ] can fit the uniform to the work'." (*Id.* at 8.)

¶ 25 We, like the trial court, find that "this direct quotation is unsupported by the deposition testimony." (Trial court opinion, 6/15/04 at 11.)

In *Collins v. Hand,* our Supreme Court stated that '(a)n expert cannot base his opinion upon facts which are not warranted by the record. No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture.'

*Capan v. Divine Providence Hospital,* 270 Pa.Super. 127, 410 A.2d 1282, 1287 (1979), quoting *Collins v. Hand,* 431 Pa. 378, 390, 246 A.2d 398, 404 (1968). As the *Capan* court continued, "Under this rule, appellant's expert could not give an opinion based on [ ] conjecture ... where the record did not establish [the defendants'] actions." *Id.* We find *Capan* and *Collins* apposite and the expert's opinion unsupported by the record evidence.

¶ 26 Additionally, we agree with the trial court that the obligations and violations to which Thaman refers in the FTI/SEA report vis-à-vis Paris are obligations and violations under OSHA and the regulations promulgated thereunder, which, by their terms, apply only to employers. (*Id.* at 10–11.) *See, e.g.,* 29 U.S.C.A. § 654, "Duties of employers and employees," providing in relevant part: "(a) Each employer—(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees[.]" (Current through P.L. 109–15, approved 06–17–05.) *See also* 29 U.S.C.A. § 652. "Definitions[,]" providing, "For the purposes of this chapter ... (5) The term 'employer' means a person engaged in a business affecting commerce who has employees, but does not include the United States (not including the United States Postal Service) or any State or political subdivision of a State." (Pub.L.

91–596, § 3, Dec. 29, 1970, 84 Stat. 1591; Pub.L. 105–241, § 2(a), Sept. 29, 1998, 112 Stat. 1572.) Appellant's expert therefore erred in applying to Paris the "Duties" section set forth *supra* and the CFR regulations applicable to employers.

¶ 27 As a result, we find misplaced employee's reliance on the factors a court should consider when determining the existence of a duty, which, in this case, clearly belonged to Penngraph pursuant to OSHA. The record is devoid of evidence that Paris assumed Penngraph's responsibility by recommending uniforms to Penngraph or that Penngraph relied upon Paris in deciding the type of uniforms its employees required. The record is also devoid of evidence that in this case, Paris inspected Penngraph's work site and knew or should have known that some employees would be exposed to situations requiring flame-retardant uniforms. *Cf. Sharpe v. St. Luke's Hospital,* 573 Pa. 90, 96, 821 A.2d 1215, 1219 (2003) (finding a sufficient relationship between defendant hospital and plaintiff to impose a duty pursuant to the first of the *Althaus* factors where "Sharpe personally presented herself to the Hospital, which was aware of the purpose of the urine screening [a random screening for drugs]; the Hospital, in turn, should have realized that any negligence with respect to the handling of the specimen could harm Sharpe's employment ... despite the absence of a contract between the two parties.").

¶ 28 Employee's remaining three issues allege trial court error in granting Gasbarre's motion for summary judgment based upon the court's finding that: 1) employee failed to produce sufficient evidence that Gasbarre manufactured the water-cooled nitrogen feed through that exploded; 2) Gasbarre had no duty to employee to ascertain the use of the product; and 3) Penngraph did not rely upon Gas-

barre's skill in furnishing a suitable feed through despite contrary evidence. We will address issues 2 and 3, employee's issues E and F, first.

¶ 29 Employee predicates his first argument in issue E on Gasbarre's duty to warn Penngraph that the nitrogen feed through should not be subjected to heat. According to employee, while employee's expert did not offer an opinion as to whether the feed through was defective due to failure to warn, nonetheless, Gasbarre was on notice, through the specification that the feed through be pressure-tested to 100 PSIG, that the component would be required to maintain pressure when in use. (Appellant's brief at 22–23.)

¶ 30 We have read most of the cases the parties cite regarding the state of Pennsylvania law on a failure to warn claim sounding in strict liability. These cases include *Jacobini v. V. & O. Press Co.,* 527 Pa. 32, 588 A.2d 476 (1991); *Wenrick v. Schloemann–Siemag Aktiengesellschaft,* 523 Pa. 1, 564 A.2d 1244 (1989) (plurality); *Colegrove v. Cameron Machine Co.,* 172 F.Supp.2d 611 (W.D.Pa. 2001); and *Willis v. National Equipment Design Co.,* 868 F.Supp. 725 (E.D.Pa.1994), *affirmed,* 66 F.3d 314 (3d Cir.(Pa.) 1995). While we recognize federal district court cases are not binding on this court, Pennsylvania appellate courts may utilize the analysis in those cases to the extent we find them persuasive. *Chiropractic Nutritional Associates, Inc. v. Empire Blue Cross and Blue Shield,* 447 Pa.Super. 436, 669 A.2d 975, 979–980 (1995). In this case, we find helpful the Honorable D. Brooks Smith's analysis in *Colegrove, supra,* of *Jacobini, supra,* and *Wenrick, supra,* as well as several federal cases interpreting Pennsylvania law, and will therefore set forth Judge Smith's analysis to the extent we find it useful.

¶ 31 In *Colegrove*, Colegrove, who worked for a paper plant, "was rethreading paper on a large winding machine when he accidentally stepped on an electric foot switch that activated the machine, causing his hand and forearm to be pulled into the machine and crushed." *Colegrove*, 172 F.Supp.2d at 615. Colegrove proceeded to trial on two theories; design defect and failure to warn of the danger of using an unguarded foot switch around heavy machinery. *Id.* at 616. It is the *Colegrove* court's analysis of the second theory we find helpful. As the *Colegrove* court opined:

> [T]here is no authoritative case from the Pennsylvania Supreme Court that explains the boundaries of the supposed limitation on a component part manufacturer's duty to warn. Of the two Pennsylvania Supreme Court opinions addressing this issue, one is a mere plurality opinion [*Wenrick*] and the other discusses the principle only in *dicta* [*Jacobini*].... The Third Circuit has opined on the limitation of a component part manufacturer's duty to warn on three occasions. *See Petrucelli v. Bohringer and Ratzinger,* 46 F.3d 1298 (3d Cir.1995); *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107 (3d Cir.1992); *J. Meade Williamson and F.D.I.B., Inc. v. Piper Aircraft Corp.,* 968 F.2d 380 (3d Cir.1992). However, these opinions point in different directions and fail to give consistent guidance as to the exact breadth of the limitation on the duty to warn.

*Id.* at 621. We will not set forth in its entirety Judge Smith's discussion of these cases, instead moving to the court's summary:

> On the one hand, where a component part manufacturer can foresee a use of its product that will create a certain danger, the manufacturer has a duty to warn of that danger. *See, e.g., Jacobini,* 588 A.2d at 480. On the other hand, where the danger is open and obvious, the manufacturer has no duty to warn. *See, e.g., Sherk v. Daisy–Heddon,* 285 Pa.Super. 320, 427 A.2d 657, 660 (1981), *rev'd on other grounds,* 498 Pa. 594, 450 A.2d 615 (1982) (no duty to warn if danger is open and obvious).... The open and obvious danger rule is properly understood as an exception to the usual duty to warn. Because the manufacturer's duty to warn attaches only to dangers associated with product uses that are deemed to be foreseeable, foreseeability is an inherent part of a ***prima facie*** case based on a failure to warn theory. The open and obvious danger rule becomes relevant only after a plaintiff has made out a ***prima facie*** case, which must include a showing that the relevant use was foreseeable.

*Id.* at 625–626 (footnote omitted).

¶ 32 We find particularly instructive for purposes of this case the *Colegrove* court's note addressing the issue of causation with regard to a strict liability claim predicated on failure to warn:

> FN. 13. The task of interpreting *Wenrick* is made more difficult by the nettlesome causation problems that arise when a component part manufacturer is involved. Many cases show that component manufacturers were frequently held to be not liable because their components played no causal role in the plaintiffs' injuries .... For example, the ***dicta*** in *Jacobini* raises the issue of Pennsylvania's limitation on a component manufacturer's duty to warn, but in the section of the *Jacobini* opinion that is ***ratio decidendi***, the court found that Danly could not be liable to the plaintiff because the plaintiff had not established the necessary causation. *See Jacobini,* 588 A.2d at 479 ('it cannot be said that

the failure to warn ... was a cause of the injuries sustained').

*Id.* at 626 n. 13.

¶ 33 Like our supreme court in *Jacobini,* we find we need not decide whether, assuming Gasbarre manufactured the nitrogen feed through that exploded, Gasbarre should have foreseen it would be exposed to pressure and should have therefore warned not to use the feed through around heat. The uncontradicted evidence presented in this case shows that Weinkauf, Penngraph's engineering manager, designed the nitrogen feed through to be used on graphitizers, fully cognizant that the feed throughs would be exposed to 50 PSIG of pressure and that they would be welded to the base of graphitizers (ovens), which reach temperatures of 4,000 to 5,000 F. Weinkauf also testified he never told Gasbarre or any of the other manufacturers of the feed throughs that they were to be used for graphitizers; the manufacturers had no involvement whatsoever in designing the feed throughs; and the manufacturers did not have the ability to change the specifications or the blueprints at all, but were required to make what Weinkauf asked them to make. (*Id.* at 21–23.) Thus, the manufacturers' involvement was limited to following the design specifications and blueprints Weinkauf provided.

¶ 34 Likewise, the evidence indicates that Ken Alt, employee's supervisor, was cognizant of the dangers associated with interrupting the flow of water to the feed through during transfer. As Alt testified, allowing water to infiltrate the furnace at such a high temperature would be "like putting pure oxygen to a fire." (Alt deposition at 78.) The result would be an enormous increase in pressure inside the graphitizer as a result of unvented gases.

¶ 35 Despite Penngraph's and Alt's awareness of the danger, however, Alt testified he and employee routinely turned the water off for a short period, between 30 seconds and one minute, while they moved the graphitizer from the heating station to the cooling station. (*Id.* at 63–66.) As Alt acknowledged, "I know there was a period of time there where we did not have water on. In other words, we had moved the graphitizer from here to here and then we'd turn the water lines back on after we got it moved."[4] (*Id.* at 63–64.) Alt was therefore aware of the danger of allowing water to get into the furnace; therefore, a warning not to use the feed through near heat would not have prevented the incident at issue.

¶ 36 The workers' compensation insurance investigator, the fire marshal, and the OSHA representative therefore attributed the explosion to human error. (Investigative Engineering Report of Almes & Associates, Inc., 5/1/98 at 7–8, ("Almes report"), R. at Exhibit K, Appendix to Gasbarre's Brief in Support of Motion for Summary Judgment, 12/12/03, R. at 122; Weinkauf deposition at 57–58; Stephens deposition at 37.) That error was not predicated on a

---

4. Alt's deposition testimony contradicted certain statements he made to John Fedorowich shortly after the explosion. (Statement of Ken Alt, 7/13/98 ("Alt statement"), R. at Exhibit J, Appendix to Gasbarre's Brief in Support of Motion for Summary Judgment, 12/12/03, R. at 122.) Alt acknowledged during his deposition that he was just guessing when he said Gasbarre built the feed through that exploded. (Alt deposition at 148.) Alt also amended his version of the cause of the explosion after hearing the OSHA experts describe how quickly pressure could build in the feed through without water. (*Id.* at 146–148.) Employee's expert, James Madden, prepared his report based on Alt's July 1998 statement, not his deposition testimony. (Report of James Madden, 9/10/03 at 2–3 ("Madden report"), R. at Exhibit L, Appendix to Gasbarre's Brief in Support of Motion for Summary Judgment, 12/12/03, R. at 122.)

failure to warn, as employee argues: Alt testified he was well aware of the danger of interrupting the water flow to the feed through, thereby allowing pressure to build so that water would penetrate the furnace.

¶ 37 Alt's testimony and Weinkauf's description of extra valves that served no useful purpose, which Alt had apparently added to the feed through, indicate that Alt did not fully understand he could maintain constant water flow to the feed through during transfer from the firing to the cooling station, as Weinkauf intended. Stephens' deposition indicates he did not understand the proper procedure either, but actually believed the valves supplying water to the base were supposed to be closed while the water lines were being disconnected, as the pictures after the explosion showed. (Stephens deposition at 37–38.)

¶ 38 Disastrously, as a result of misinformation apparently circulating on the employees' grapevine, Alt also did not know how quickly pressure could build without water flow to the feed through. As Alt testified, after the explosion, when Penngraph and others were attempting to ascertain its cause:

And of course the conclusion was is that it had to come from water getting into the furnace. And it was mentioned in this deposition is that the water coming into the furnace obviously came from the base that fed the furnace. And for that to have happened, then there had to be a leak.

. . . .

And of course that was something that came out, I believe it was —— I know it was in one of the meetings. *Because like we were always told at the plant that you had up to five minutes from when you started connecting and disconnecting lines before you'd have to* *worry about it.* I believe it was a fellow from OSHA that told us this. *He said that it was just a matter of seconds that [pressure] would buil[d] up like 150 thousand pounds of pressure per square inch.* You know, that water would build up that much pressure.

. . . .

In other words, when water was not circulating, you know.

Alt deposition at 134–135 (emphasis added). As Alt continued, he believed it was "the fellows from OSHA that told us this . . . . And you know, most of us that worked around the furnaces were all kind of surprised because we had never been given that information before." (*Id.* at 140–141.) As a result, after the explosion, Penngraph re-designed the feed through to remove water from the base entirely and to use sand instead. (*Id.* at 136–137.)

¶ 39 Thus, the record in this case painfully establishes the cause of the explosion that so devastatingly injured employee. That cause was a danger inherent in the design of the feed through, of which its designer was well aware. Alt's testimony indicates he was also aware of the danger, if not its extent, but apparently had not been adequately trained or supervised in using the procedure Weinkauf intended Alt and employee to follow to avoid the danger.

¶ 40 We therefore find, as in *Jacobini*, that a failure to warn not to use the feed through near heat did not, as a matter of law, cause the explosion. *Jacobini, supra* at 39, 588 A.2d at 479 (holding that where component part manufacturer's die set was safe and was constructed in a manner that eliminated the need for operators to place their hands or fingers into the operational point, Jacobini did not establish that component part manufacturer's failure to warn

of a need for a point of operation guard was the proximate cause of his injuries).

¶ 41 Nor does employee's alternative argument, that the feed through malfunctioned, withstand scrutiny as employee has not presented evidence of a malfunction or eliminated abnormal use. *See O'Neill v. Checker Motors Corp.*, 389 Pa.Super. 430, 567 A.2d 680, 682 (1989) (opining that to succeed on a malfunction theory, appellant had to present a case-in-chief evidencing the occurrence of the malfunction and eliminating abnormal use or reasonable, secondary causes for the malfunction). To the contrary, the evidence establishes that Penngraph tested all of the new feed throughs twice; first after attaching them to the hoses, and again prior to using them to ensure they would withstand normal pressure. (Weinkauf deposition at 29–30.); (Alt deposition at 149–150.) In this case, the record also establishes that employee and Alt subjected the feed through to far more pressure than it was either designed or manufactured to withstand by cutting off the water supply for 30 seconds to one minute.

¶ 42 Finally, employee argues trial court error in dismissing his claim that Gasbarre breached the implied warranty of fitness for a particular purpose because Penngraph relied on Gasbarre's skill in furnishing a suitable feed through. As we have already indicated, however, the evidence in the form of Weinkauf's deposition testimony indicates Weinkauf designed the feed through and allowed no exceptions or alterations to his design. *See Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1309 (3d Cir.(Pa.) 1995) (observing that under Pennsylvania law, "An implied warranty of fitness for a particular purpose applies '[w]hen the seller at the time of contracting has reason to know: (1) any particular purpose for which goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods.'"), (quoting 13 Pa.Cons. Stat.Ann. § 2315 (1984).). In that case as in this, "[plaintiff] has failed to present sufficient evidence of the statutory elements to support his claim of implied warranty of fitness. There is, in fact, no evidence that he relied at any time on the skill or judgment of [defendant]." *Petrucelli*, 46 F.3d at 1310 n. 14.

¶ 43 We therefore conclude that regardless who manufactured the feed through, employee's claims against its manufacturer must fail, as employee has not met his burden of establishing a ***prima facie*** case that either a failure to warn or a manufacturing defect caused the explosion or that Gasbarre breached an implied warranty of fitness for a particular purpose.

¶ 44 Having found no merit to any of employee's issues, we must therefore conclude the trial court did not err in granting the remaining defendant/appellees' motions for summary judgment. Penngraph alone, through its improper uniform selection, dangerous component part design, and inadequate training and education of employees, breached the duty OSHA imposes, that "(a) Each employer—(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees[.]" 29 U.S.C.A. § 654(a)(1).

¶ 45 Order granting motions for summary judgment affirmed.