J-A20030-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 235 WDA 2020 |

Appeal from the Order Entered January 29, 2020
In the Court of Common Pleas of Erie County Criminal Division at No(s):
304 OF 2018

| | | |
|---|---|---|
| IN THE INTEREST OF J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 241 WDA 2020 |

Appeal from the Order Entered January 29, 2020
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-DP-0000083-2017

BEFORE:   BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    FILED OCTOBER 19, 2020

M.W. ("Mother") appeals from the permanency review orders dated January 21, 2020, and entered on January 29, 2020, changing the permanency goals for her two dependent, minor children, J.C., a male born in

March of 2011,[1] and J.W., a female born in October of 2017,[2] (collectively, the

"Children"), from concurrent goals of reunification and adoption to adoption

pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[3]  We affirm.

_____

[1] The trial court noted that J.W.'s father is unknown, and J.C.'s father is J.T.C., who is not a party to the present appeal.  Trial Court Opinion, 3/17/20, at 1. Further the trial court stated:

> [J.T.C.] has not challenged the change of goal to adoption, and[,] therefore[,] [Mother's] claims are not dependent on [J.T.C.]. [J.T.C.] has been uninvolved in J.C.'s life.  He demonstrated very minimal participation in J.C.'s prior adjudication of dependency which resulted in reunification of J.C. [with Mother].  Since the Emergency Protective Order issued in December 2018 until the current time, [J.T.C.] has had no contact or involvement with J.C. A Petition to Involuntarily Terminate [J.T.C.'s] Parental Rights was filed on January 29, 2020, and the [trial court] will not address [J.T.C.'s] position any further in this Opinion.

Trial Court Opinion, 3/17/20, at 1, n.3.

[2] Throughout the proceedings, Mother has been represented by Attorney Emily Merski, who filed a brief on appeal on her behalf.  Attorney Amy Jones represented the Erie County Office of Children, Youth, and Families ("OCY") until May 12, 2020, when Attorney Anthony G. Vendetti entered his appearance on behalf of OCY with this Court.  OCY did not file a brief on appeal.  The Children have been represented by guardian ad litem ("GAL") Attorney Michelle Alaskey, who also served as their legal interests counsel, and who filed a brief on their behalf on appeal.

At the time of the hearing, J.C. was eight years and ten months old, and J.W. was two years and three months old.  In In re J'K.M., 191 A.3d 907, 912 (Pa. Super. 2018), we stated:

> [A] dependency court is required by statute to appoint a GAL, who must be an attorney.  42 Pa.C.S. §6311(a).  The GAL is authorized to represent both a child's legal and best interests.  Id.  Pursuant to Section 6311(b)(7), the GAL's duties on representing a child's best interest include making recommendations to the court

_____

> regarding a child's placement needs. However, under Section 6311(b)(9), the GAL is to represent a child's legal interests by determining "to the fullest extent possible," a child's wishes, if those wishes are ascertainable. Factors that must be considered when ascertaining a child's wishes, or legal interests, are a child's age and mental and emotional condition. 42 Pa.C.S. §6311(b)(9). The difficulty arises when, as occurred in this case, the two interests conflict. In this regard, we find In re Adoption of L.B.M., 639 Pa. 428, 161 A.3d 172 (2017) instructive, despite that case involving the appointment of counsel in termination of parental rights cases under 23 Pa.C.S. §2313.

Id. at 913. In J'K.M., we held that divergent opinions between the child and the attorney who served as both child's counsel and the child's GAL as to whether child should be placed with her mother constituted a conflict, and, thus, the appointment of a separate GAL to represent child's best interests was warranted. Id. at 916. See In re T.S., 648 Pa. 236, 192 A.3d 1080 (2018) (termination case in which the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). Here, the trial court did not err in allowing Attorney Alaskey to act as the Children's sole representative, as J.W. was too young to express a preferred outcome, and the GAL's recommendation concerning the best interests of J.C. and J.C.'s legal interests (preferred outcome) in the matter did not conflict. Attorney Alaskey interviewed J.C. regarding his preferred outcome, and the court did not identify any conflict of interest between J.C.'s best interests and his legal interests at the permanency review hearing on January 15, 2020. See N.T., 1/15/20, at 33-35. In fact, in her brief on appeal, Attorney Alaskey agrees with the trial court that the record clearly supports the goal change to adoption as best suited to the safety, protection and physical, mental, and moral welfare of the Children, and asks us to affirm the orders. GAL/Legal Interest Counsel's Brief on Behalf of the Children, 5/11/20, at 5-6. We do not comment on the quality of the GAL's representation of the Children in this matter. See In re: Adoption of K.M.G., 219 A.3d 662, 669 (Pa. Super. 2019) (en banc) (holding that this Court has authority only to raise sua sponte the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation), appeal granted in part, 221 A.3d 649 (Pa. 2019).

The trial court set forth the factual background and procedural history of this appeal as follows.

### A. 2017 Dependency Proceedings Re: J.C.

Regrettably, J.C. became involved in the Juvenile Dependency system in early 2017, when he was 6 years old. On March 27, 2017, it was reported to [OCY] that [Mother] had been arrested on drug charges and J.C. had been removed from the

_____

[3] The trial court noted that, on January 29, 2020, OCY filed petitions for involuntary termination of Mother's parental rights to both of the Children pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8), and (b), and the court scheduled an evidentiary hearing for March 13, 2020. Trial Court Opinion, 3/17/20, at 15. Attorney Alaskey noted in her brief that the trial court held the evidentiary hearing on March 13, 2020, and, by order dated March 19, 2020, terminated Mother's parental rights to both Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8). GAL/Legal Interest Counsel's Brief on Behalf of the Children, 5/11/20, at 2. Further, Attorney Alaskey noted that Mother failed to appeal the termination orders by April 20, 2020. Id. Attorney Alaskey did not indicate that Mother filed appeals from the termination orders, nor does this Court's docket reflect any such appeals. Attorney Alaskey suggests that the termination of Mother's parental rights may render moot this appeal from the orders changing the Children's permanency goal to adoption. Id. We may not find the appeal moot, however, as the termination matter is not part of the certified record before us, and we are limited to considering the certified record regarding the goal change in this matter. See generally, Commonwealth v. Preston, 904 A.2d 1 (Pa. Super. 2006) (en banc). Thus, we will proceed to review the goal change orders on appeal, as the goal change orders are independent of the termination orders. See In re Adoption of S.E.G., 587 Pa. 568, 910 A.2d 1017 (2006), in which our Supreme Court reaffirmed that the trial court need not first change the permanency goal for a child to adoption before considering a petition to terminate parental rights. Id. at 570-72, 901 A.2d at 1018-19. In so ruling, the Supreme Court approved of "concurrent planning", which it defined as "a dual-track system under which child welfare agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail." Id.; see also In re M.G., 885 A.2d 68, 71-72 (Pa. Super. 2004) (goal change from reunification to adoption is not required for parental rights to be involuntarily terminated).

residence, which contained an active methamphetamine lab. (See Emergency Protective Order Application, 3/28/2017). Thereafter, an Emergency Protective Order was issued by the [trial court] on March 28, 2017, finding that removal of the minor child was necessary for the welfare and best interests of the child, reasonable efforts to prevent removal or provide for reunification were made, and that, due to the emergency nature of the removal and safety considerations of the child, any lack of services to prevent removal were [sic] reasonable. (See Emergency Protective Order, 3/28/2017). Consequently, J.C. was placed in the temporary protective physical and legal custody of OCY. Thereafter, J.C. was placed in a foster home[,] as there was no viable family or kinship resource.

Subsequently, a Shelter Care Hearing pursuant to 42 Pa.C.S.A. § 6332 was held before the Juvenile Hearing Master, Carrie Munsee, Esq., on March 30, 2017. (See Master's Recommendation for Shelter Care and Order, 4/7/2017). The Master found sufficient evidence was presented to prove that the continuation or return of the child to the home of [Mother] was not in the best interests of the child. Id. The Master noted that [Mother] was currently incarcerated and [J.T.C.'s] whereabouts were unknown, and[,] consequently[,] recommended the child's placement remain in foster care. Id. The [trial court] signed an Order adopting the Master's Recommendation on April 7, 2017. Id.

A Dependency Petition for J.C. was filed by OCY on March 31, 2017. (See Dependency Petition, 3/31/2017). OCY averred J.C. was without proper parental care or control, alleging the following: [Mother's] history with OCY due to concerns regarding her abusing drugs and unstable housing; [Mother's] abuse of drugs, specifically that the child was present in the home where there was an active methamphetamine lab; [Mother's] criminal history and pending criminal charges, including drug offenses; and [Mother's] present incarceration. Id[.] at 3-4.

An Adjudication Hearing was held on April 6, 2017, before Master Munsee. (See Recommendation for Adjudication and Disposition, 4/13/2017). At the hearing, [Mother] stipulated to the allegations outlined in the Dependency Petition. Id. at 1. Thereafter, J.C. was adjudicated dependent by Order of April 10, 2017. Id. at 4. J.C.'s permanent placement goal was to return

to parent[,] and a three[-]month Review Hearing was scheduled for July 24, 2017.  Id. at 2-3.

The [trial court] conducted a Review Hearing on July 24, 2017, and found [Mother] had been moderately compliant with the permanency plan.   (See Permanency Review Order, 7/24/2017).  The [trial court] ordered that the child remain in the foster home, [and] that the permanent placement goal [would] remain return to parent, and scheduled a six[-]month Review Hearing. Id. at 2-3. Subsequently, on August 24, 2017, the [trial court] issued an Order returning J.C. to [Mother].  (See Order, 8/24/2017).  On October 11, 2017, OCY filed a Motion to Close Juvenile Dependency in regards to J.C., which the [trial court] granted by Order of October 16, 2017.  (See Motion, 10/11/2017 and Order, 10/16/2017).

Trial Court Order, 3/17/20, at 2-3 (footnotes omitted).

The trial court then discussed the circumstances surrounding the 2018 adjudication of dependency for J.C. and J.W., as follows.

B. 2018 Dependency Proceedings re: J.C. and J.W.

. . . Shortly after J.C. was returned to [Mother's] custody, [Mother] gave birth to the minor child, J.W.[,] in October 2017. [Mother] and the minor children had informal contact with OCY between October 2017 and December 2018.  However, on December 11, 2018, Erie Police officers found [Mother] lying on the sidewalk in an apparent overdose from K2.[1]  (See Emergency Protective Order Applications, 12/12/2018).  [Mother] was unable to verbalize where she had left J.W., her infant child.  Id.  Upon locating the minor children with the maternal grandmother, it was also revealed that [Mother] was being evicted from her apartment.  Id.  [Mother] was arrested and incarcerated.  Id. Importantly, J.C.'s father had no contact or involvement with the minor child[,] and J.W.'s father is unknown.

Thereafter, on December 12, 2018, OCY filed an Emergency Protective Order Applications at each docket in regards to J.C and J.W.  The [trial court] signed the Emergency Protective Orders on December 12, 2018, finding that removal of the minor children was necessary for the welfare and best interests of the [C]hildren and that, due to the emergency nature of the removal and safety

considerations of all of the [C]hildren, any lack of services to prevent removal were [sic] reasonable. (See Emergency Protective Orders, 12/12/2018). The [C]hildren were placed in foster homes.

On December 19, 2018, a shelter care hearing was held before the [trial court]. (See Shelter Care Orders, 12/20/2018). The [trial court] found sufficient evidence was presented to prove that the continuation or return of the [C]hildren to the home of [Mother] was not in the best interest of the [C]hildren. Id. The [trial court] noted that [Mother] was currently incarcerated, and[,] consequently ordered the [C]hildren's placement remain in foster care. Id.

Formal Dependency Petitions for J.C. and J.W. were filed by OCY on December 20, 2018. (See Dependency Petitions, 12/20/2018). OCY alleged the [C]hildren were without proper parental care or control and set forth the following: [Mother's] history with OCY wherein the minor child, J.C., had previously been removed from her care and adjudicated dependent; [Mother's] drug problem which affected her ability to safely parent the [Children], as evidenced by the incident on December 11, 2018 (wherein [Mother] was under the influence and in need of medical care but could not verbalize to law enforcement where J.W. was located); unstable housing; [Mother's] incarceration and her criminal history, to include drug offenses and endangering the welfare of children, as well as her pending criminal charges. Id. at 3-4.

An adjudication hearing was held on January 3, 2019, before Master Munsee. (See Recommendations for Adjudication and Disposition, 1/7/2019 at 1). Due to her incarceration, [Mother] appeared by telephone and was represented by Attorney Merski. Id. [Mother] stipulated to the allegations outlined in the Dependency Petition with the amendment of the phrase "appeared to be" prior to the allegation of "under the influence." Id. The GAL agreed with the adjudication of dependency. Id. Thereafter, J.C. and J.W. were adjudicated dependent on January 7, 2019. Id. at 4. The hearing then proceeded immediately to disposition. [Mother] was ordered to participate in drug and alcohol programs and mental health programs during her incarceration; participate in a mental health assessment and follow treatment recommendations; refrain from the use of drugs and alcohol and submit to random testing; participate in a drug and alcohol

assessment and follow treatment recommendations; maintain safe and stable housing; attend all medical and mental health appointments for the children, particularly J.C.; participate in Family Based Mental Health services; and participate with Justice Works in a visitation and parenting program. Id. at 3.

The [C]hildren's permanent placement goal was reunification and to "return to parent". Id. A three[-]month Review Hearing was scheduled for April 8, 2019. Id. at 2-3.

_____

[1] K2 is a synthetic cannabinoid drug.

Trial Court Opinion, 3/17/20, at 4-6 (footnote added).

The trial court set forth the history of the first permanency review hearing for both Children in this matter as follows.

The initial permanency review hearing was held on April 8, 2019 before the [trial court]. (See Permanency Review Orders, 4/15/2019). At the hearing, [Mother] appeared with Attorney Merski. The [trial court] found that during the review period [Mother] had been minimally compliant with the permanency plan for J.C., because she had failed to participate in Family Based Mental Health services, failed to attend the intake meeting for mobile therapy, continued to be involved with an inappropriate individual, M.B. (involvement with drugs and alleged abuse); and had not fully participated in Justice Works['] visitation and parenting program. (See Permanency Review Order, 4/15/2019; Court Summary, 4/8/2019). The [trial court] found [Mother] had been moderately compliant with the permanency plan for J.W. because she continued to be involved with an inappropriate individual, M.B., and had not fully participated in Justice Works['] visitation and parenting program. Id. at 1. The [trial court] ordered that the [C]hildren remain in the foster home. Id. at 2. [Mother] was ordered to continue participating in mental health treatment with Stairways Behavioral Health; refrain from the use of drugs and alcohol and submit to random testing; maintain safe and stable housing, to include having appropriate individuals in the home; attend medical, dental and educational appointments for the [C]hildren; participate in the [C]hildren's therapies; and continue to participate with Justice Works in the visitation and parenting program. Id. at 3. The [trial court] ordered the

permanent placement goal was to return to parent[,] and a six[-]month review hearing was scheduled for October 21, 2019. Id. at 3.

On May 23, 2019, the [trial court] issued Orders suspending visitation with both children until [Mother] could demonstrate compliance with the court-ordered drug screens by having thirty days of clean urines. (See Orders, 5/23/2019 and WT Petitions, 1/29/2020).

Trial Court Opinion, 3/17/20, at 6-7.

The trial court set forth the history of the second permanency review hearing as follows.

The second permanency review hearing was held on October 21, 2019. (See Permanency Review Orders, 10/31/2019). At the time of the hearing, [Mother] appeared with Attorney Merski. The [trial court] found [Mother] had been minimally compliant with the permanency plans for both children during the review period because she had only completed three out of seven therapy sessions with Stairways Behavioral Health, attended two out of eight scheduled appointments with Stairways Behavioral Health, and reported she had not been taking her medications or sleeping. (See Permanency Review Order, 10/31/2019; Court Summary, 10/21/2019). [Mother] had been incarcerated for a probation violation when she relapsed on K2. Id. During the review period, [Mother] had six no-show positive urine screens and one could not produce positive urine screen. Id. [Mother] was residing in a home that had been deemed uninhabitable by Code Enforcement. Id. [Mother] missed several medical and mental health appointments for the [C]hildren during the review period, and missed several scheduled visitations. Id.

[In an order dated October 24, 2019 and entered on October 31, 2019, the trial court] ordered that the [C]hildren remain in the foster home. Id. at 2. Further, visitation was to continue with [Mother] and the [C]hildren, but was contingent on [Mother] being drug and alcohol[-]free. Id. at 3. [Mother] was ordered to continue participating in mental health treatment with Stairways Behavioral Health; refrain from the use of drugs and alcohol and submit to random testing; maintain safe and stable housing, to include having appropriate individuals in the home; attend

- 9 -

medical, dental and educational appointments for the [C]hildren; participate in the [C]hildren's therapies; and continue to participate with Justice Works in the visitation and parenting program. Id. at 3. Further, the [trial court] ordered goal changes[,] regarding the permanent placement for both minor children[,] to return to [Mother] concurrent with adoption, and a three[-]month Review Hearing was scheduled for January 15, 2020. Id. at 2-3.

Trial Court Opinion, 3/17/20, at 7-8.

The trial court explained the motion for a change of permanency goal to

adoption and the third permanency hearing as follows.

On December 20, 2019, OCY filed a Motion for Change of Placement, requesting the [C]hildren's permanent placement goals be changed to adoption at the next permanency review hearing on January 15, 2020.

C. Review Hearing of January 15, 2020 – Change of Goal to Adoption

. . . At the review hearing on January 15, 2020, [Mother] appeared with Attorney Merski. The [C]hildren's GAL, Attorney Alaskey, was also present. The [trial court] received documents and reports from service providers Affinity Support Services, Justice Works, and Stairways Behavioral Health reports, as well as a Court Summary with docket information prepared by OCY. The [trial court] made these documents part of the record. (See Permanency Hearing Transcript, 1/15/2020 (hereinafter "N.T.") at 16; see also, Court Summary, 1/15/2020).

During the hearing, the [trial court] listened to testimony from the OCY caseworker, Haley Schaef, and [Mother]. See N.T.

Trial Court Opinion, 3/17/20, at 8-9.

The trial court summarized the testimony of Ms. Schaef regarding the

Children as follows.

Ms. Schaef testified that J.W. was doing very well in the foster home, which was also a pre[-]adoptive home. N.T. at 18.

Ms. Schaef advised that J.C. had been in the foster home with J.W. from December 2018 until August or September 2019, at which time he was removed due to negative behaviors and placed in another foster home. Id. In November 2019, J.C. was removed from the second foster home due to negative behaviors and was placed at the Edmund L. Thomas Detention Center[,] where he currently resides. Id. at 18-19. It was acknowledged that J.C. does have mental health needs and significant attachment issues, including diagnoses of Reactive Attachment Disorder, Post-Traumatic Stress Disorder, Attention Deficit/Hyperactive Disorder, Disruptive Mood Dysregulation Disorder, and learning disorders. Id. at 22; (see also, Court Summaries, 7/24/2017; 4/8/2019; 10/21/2019; and 1/15/2020). Ms. Schaef explained that OCY was looking to place J.C. in a therapeutic foster home for his mental health needs. N.T. at 18-19.

Trial Court Opinion, 3/17/20, at 9.

The trial court summarized the testimony of Ms. Schaef concerning

Mother's compliance with her objectives as follows.

Ms. Schaef testified that [Mother] has demonstrated overall minimal compliance throughout the dependency case. [N.T.] at 17. [Mother] had been discharged from Justice Works, a service provider that was intended to help [Mother] with parenting skills and designed to help her meet J.C.'s special needs. Id. at 17-18; (see also, Letter from Justice Works dated 12/19/2019, attached to Court Summary, 1/15/2020). [Mother] was discharged due to non-compliance, including poor attendance, collaboration with team meetings, inappropriate behaviors, and lack of progress with parenting goals. Id. Since the last permanency hearing on October 21, 2019, [Mother] had been approved for two visit coaching sessions per week, for a total of sixteen sessions, but had only attended six sessions. (See Letter from Justice Works). One of the visits was cut short because [Mother] was suspected of being under the influence. (See Letter from Justice Works; Court Summary, 1/15/2020 at 21). On another visit on November 15, 2019, [Mother's] paramour, J.P, arrived and interrupted the visit. Id. Justice Works and OCY had previously informed [Mother] that J.P. was not to have contact with the [C]hildren[,] and he was asked to leave the facility. Id. at 21-22. [Mother] became very agitated and ended the visit with the [C]hildren. Id. [Mother] failed to attend any further visits or meetings after this

incident. Id. As of December 19, 2019, [Mother] was discharged from Justice Works, as noted in the conclusion of the Letter from Justice Works:

> At this time, it would be the expectation of Justice Works YouthCare visit coaching program that [Mother] would have progressed to additional visitations with a more monitored level of supervision or even an unsupervised visitation schedule[;] however, this is not the case[,] as [Mother] remains inconsistent and lacks the ability to engage her children in an age[-]appropriate manner. At this time [Mother] has been discharged from Justice Works YouthCare Visit Coaching program due to her noncompliance . . . including but not limited to attending and confirming visitations, collaborating with team meetings, inappropriate behaviors, and lack of progress regarding her parenting treatment goal and objects.

Id.

Trial Court Opinion, 3/17/20, at 9-10.

The trial court summarized the testimony of Ms. Schaef concerning Mother's mental health diagnosis as follows.

> Additionally, Ms. Schaef testified regarding [Mother's] diagnoses, including bipolar disorder, post-traumatic stress disorder, and anxiety disorder, which required consistent mental health treatment. N.T. at 19-20. Since the last permanency hearing in October 2019, [Mother] had been only minimally compliant with her mental health treatment at Stairways Behavioral Health, and was inconsistent in attending her scheduled appointments. Id. at 19-20; (see also, Stairways Behavioral Health reports, attached to Court Summary, 1/15/2020). [Mother] had missed half of her appointments early in the review period. Id. However, she made nearly all appointments just prior to the court date. Id. OCY had concerns about [Mother's] report to Stairways that she was only sleeping two to three hours a night and was not taking her medications consistently. N.T. at 20.

Trial Court Opinion, 3/17/20, at 10-11.

The trial court summarized the testimony of Ms. Schaef regarding Mother's living situation and drug use as follows.

> Ms. Schaef further testified about OCY's concerns with [Mother's] living situation with J.P. and R.M. [N.T.] at 22-23; 27-28. Both J.P. and R.M. lived essentially in the same residence as [Mother]. Id. J.P. had prior involvement with OCY and has had his parental rights involuntarily terminated to three of his own children. Id. at 22; 36-38. R.M. is a registered sex offender. Id. at 22-23; 38; 45; (see also, Pennsylvania State Police Report, attached to Court Summary, 1/15/2020). [Mother] had been living with R.M. until late December 2019. However, immediately prior to the hearing, she reported to OCY she had moved in with J.P. N.T. at 22-23; 26-27; 36; 45. Testimony revealed that J.P., R.M., and [Mother] live in the same apartment building, on the same floor, with only a doorway separating the apartments. Id. Consquently [sic], it is as if they are living in the same residence within close proximity to each other. Id. at 23; 27-28.

> Ms. Schaef reported OCY has ongoing concerns about [Mother's] drug use and suspected that [Mother] was using K2. Id. at 26-27; 29-30. [Mother] was being drug tested, but only every three to four weeks. Id. at 30. Ms. Schaef noted that [Mother] did test positive for norfentanyl on December 9, 2019. Id. at 26-27. [Mother] reported she had received the norfentanyl at the emergency room, but failed to provide documentation of the visit to Ms. Schaef. Id.

Trial Court Opinion, 3/17/20, at 10-11.

The trial court summarized the testimony of Ms. Schaef regarding Mother's visitation and contacts with the Children as follows.

> Ms. Schaef also testified regarding [Mother's] visitation and contacts with the minor children. N.T. at 20-22. Ms. Schaef stated she had received reports from J.W.'s daycare provider that there are noticeable negative changes in the child's behaviors after visits with [Mother]. Id. at 32. Regarding J.C., Ms. Schaef reported [Mother] had only visited with the child six out of twelve scheduled times since the October 21, 2019 permanency hearing. Id. at 20. [Mother] did not visit with J.C. at any time between November 21, 2019 and December 21, 2019. Id. at 22. Ms.

Schaef reported J.C. displayed negative behaviors after visitations with [Mother] and particularly struggled with her inconsistency. Id. at 20-22. After [Mother] cancelled a visit on December 26, 2019, only twenty minutes before it was set to begin. It was reported by providers at Edmund L. Thomas [Detention Center] that J.C. became defiant with staff and his entire demeanor had changed. Id. at 21. Clearly, [Mother's] inconsistency was having a negative impact on J.C. [Id.]

Trial Court Opinion, 3/17/20, at 11-12.

The trial court summarized Ms. Schaef's testimony concerning the

Children's placements as follows.

Finally, Ms. Schaef testified regarding the [C]hildren's placements. She confirmed J.C. had been previously adjudicated [dependent] in April 2017 based on [Mother's] mental health and drug use, which were essentially the same reasons supporting the current adjudication. [N.T.] at 24-25. J.C. has wavered between wanting to see [Mother] and not wanting contact with her. Id. at 20; 31. J.C. reported to his therapist that he is scared to return to [Mother] and is concerned about her drug usage. Id. at 31-32. When Ms. Schaef discussed adoption with J.C. immediately prior to the hearing, J.C. advised he wanted to return to either [Mother] or his previous foster home. Id. at 32. However, all other times Ms. Schaef had discussed the prospect of adoption with J.C., he consistently reported that he would like to be adopted. Id. Ms. Schaef agreed that J.C. was in "desperate need of permanency." Id. at 25. Regarding J.W., Ms. Schaef indicated that the child has been in the foster home for nearly her entire life[,] and the home is meeting her needs. Id. at 25.

Trial Court Opinion, 3/17/20, at 12.

The trial court discussed the recommendation of the Children's legal

counsel/GAL as follows:

At this permanency review hearing, the [trial court] asked the GAL, Attorney Alaskey, what her position was regarding the change of goal to adoption. [N.T.] at 33. The GAL stated she fully supported the change of goal to adoption. Id. at 33. The GAL reported that she had spoken with J.C., and he had reported to

her that he would like to return to the foster home where J.W. is placed, and did not indicate any desire to return to [Mother]. Id. The GAL explained that she had spoken with J.C.'s counselor, who had reported his behavior and demeanors change negatively after visits with Mother. Id. at 33-34. The GAL advised the [trial court] that it was her belief that visitation between [Mother] and J.C. has a negative impact on the child. Id. at 33. Additionally, the GAL was troubled by [Mother's] relationship with J.P. Id. at 34-35. She was concerned with [Mother's] history of engaging in inappropriate conversations with J.C. during visits, including telling J.C. he would be coming home and living with [Mother], J.P., and J.P.'s son. Id. The GAL noted:

> I'm concerned that this isn't mom's first rodeo. [J.C.] has been in placement a total of, I believe, 18 months at this point. And mom isn't making progress, and she's seemingly not learning anything from all of the services that have been offered to her. And I think that overall, it does have a negative impact on [J.C.] and his ability to progress, and his ability to find permanency moving forward.

Id. at 34.

Trial Court Opinion, 3/17/20, at 12-13.

The trial court summarized Mother's testimony concerning her compliance with her objectives, as follows.

> Next, [Mother] testified on her own behalf, expressing to the [trial court] that she believed it was in the [C]hildren's best interest to allow her to continue to work on her treatment plan. [N.T.] at 35-36. [Mother] admitted she had lived with R.M. for several months and had found out from OCY in November that R.M. was a registered sex offender. Id. at 38; 45. [Mother] confirmed she had finally moved from R.M.'s apartment "a few weeks ago," at the beginning of January, and was now living with J.P. in the apartment next to and sharing a door with R.M. Id. at 45; [sic] 54.
>
> Further, [Mother] admitted she was aware that OCY had terminated J.P.'s rights to three of his children, but stated she did not know why. Id. at 37. When the [trial court] asked if that was

concerning to her, [Mother] responded: "Not my kids." Id. On cross-examination by the GAL, [Mother] denied that OCY had told her the housing situation was unsafe. Id. at 47. When the [trial court] asked if she thought it was safe, [Mother] answered that she thought it was, in fact, safe. Id.

[Mother] testified she treats for her mental health and drug and alcohol issues at Stairways. Id. at 38-40. She denied using K2. Id. at 40. [Mother] testified she was taking samples of her medications but was waiting on prior authorizations from her insurance for the full prescriptions. Id. at 38-39. [Mother] stated she worked with her blended case manager for appointments. Id. at 40. [Mother] explained she planned to attend anger management classes "in a week or two." Id. at 39. [Mother] testified she was compliant with her probation. Id. at 46. However, on cross-examination, [Mother] confirmed she had an outstanding warrant based on her failure to pay fines[,] and was aware she was going to be incarcerated immediately after the hearing. Id. [Mother] acknowledged she did not have the present ability to pay the fine. Id. at 46; 49. When questioned about income, [Mother] confirmed she is not working and is applying for Supplemental Security Income for disability for back problems. Id. at 44; [sic] 46. Despite this, [Mother] stated she could "get a job easily if [she] needed to." Id. at 44.

[Mother] testified regarding her interactions with the [C]hildren. [Mother] admitted she did not participate in any of J.C.'s therapy sessions and claimed she did not know about them. Id. at 40-41. [Mother] agreed she is aware of J.C.'s behavioral issues, but stated she believes it is because J.C. wants to come home with her. Id. at 41-42. [Mother] also admitted she knew that J.W. had begun speech therapy with Early Intervention but had not attended any appointments "because she didn't get a phone call." Id. at 48. When questioned about her discharge from Justice Works, [Mother] testified the reasons given for the discharge were "news to her" because she was "doing good." Id. at 43. [Mother] testified if the [trial court] were to give her additional time, she would "do everything in her power for her kids." Id. at 42.

At the conclusion of cross-examination by OCY, the following exchange took place [between counsel for OCY and Mother]:

ATTORNEY JONES: So, [J.C.] has spent eighteen months in placement, correct?

[MOTHER]: Correct.

ATTORNEY JONES: And as you stand here today, you don't have a regular prescription for your medication; you have a warrant to go to jail; you have no job, no money; and are living in an apartment house with two very questionable people. Would you agree with that?

[MOTHER]: Yes.

Id. at 46-47.

Trial Court Opinion, 3/17/20, at 13-15.

At the close of the hearing, the [trial court] stated:

This is certainly an important decision. Let me just tell you, [Mother], I do thoroughly believe that you love your children. I have the responsibility of ensuring their best interests are protected. I don't know how it goes on for eighteen months for [J.C.] that we aren't in a better place than when we started. [J.W.] is sort of neutral, which itself isn't good, either. But there are heavy concerns about [J.C.] and his age and his mental health status. This whole process has not been good for him. He needs the stability and permanency. I do think, after reviewing this, that in the best interest, I am going to change the goal. . .

Id. at 56-57.

Trial Court Opinion, 3/17/20, at 15.

In orders dated January 21, 2020 and entered on January 29, 2020, the trial court ordered a change in permanency goal to adoption for the Children. On February 18, 2020, Mother timely filed notices of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P.

1925(a)(2)(i). On March 11, 2020, this Court, acting sua sponte, consolidated the two appeals.

In her brief on appeal, Mother raises one issue, as follows.

Whether the juvenile court committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification was no longer feasible and changed the goal to adoption?

Mother's Brief, at 3.

Our standard of review in a dependency case follows:

We review an order regarding a placement goal of a dependent child under an abuse of discretion standard. In re B.S., 861 A.2d 974, 976 (Pa. Super. 2004). In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. In re N.C., 909 A.2d 818, 822-23 (Pa. Super. 2006) (citation and internal quotation marks omitted).

When this Court reviews a trial court's decision to change a permanency goal, we are bound by the facts as found by the trial court if they are supported by the record. In re K.J., 27 A.3d 236, 241 (Pa. Super. 2011). In addition, it is the responsibility of the trial court to evaluate the credibility of the witnesses and resolve any conflicts in the testimony. In re N.C., supra at 823. Accordingly, the trial court is free to believe all, part, or none of the evidence. Id. (citation omitted). Provided the trial court's findings are supported by competent evidence, this Court will affirm, even if the record could also support an opposite result. In re Adoption of R.J.S., 901 A.2d 502, 506 (Pa. Super. 2006) (citation omitted).

Interest of H.J., 206 A.3d 22, 25 (Pa. Super. 2019) (internal quotation marks omitted).

Further, we have stated:

- 18 -

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." In re R.J.T., 608 Pa. 9, [27], 9 A.3d 1179, 1190 (2010). We review for abuse of discretion[.]

In Interest of: L.Z., A Minor Child, 641 Pa. 343, 360, 111 A.3d 1164, 1174 (2015).

With regard to a dependent child, in In re D.A., 801 A.2d 614 (Pa. Super. 2002), this Court explained:

A court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

Id. at 617.

Section 6351(e) of the Juvenile Act provides, in pertinent part:

(e) Permanency hearings.—

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and

> communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court. . . .

\* \* \*

42 Pa.C.S.A. § 6351(e).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

In re A.K., 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> (f.1) Additional determination.—Based upon the determinations made under subsection (f) and all relevant

evidence presented at the hearing, the court shall determine one of the following:

\*     \*     \*

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

After the court has made a determination as to the appropriate placement goal, the court shall issue an order regarding "the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S.A. § 6351(g).

On the issue of a placement goal change, this Court has stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. See In re Sweeney, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." In re E.F.V., 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

In re K.C., 903 A.2d 12, 14-15 (Pa. Super. 2006).

In her brief on appeal, Mother contends that the trial court committed an abuse of discretion and/or error of law when it concluded that the best interests of the Children were not being met with a goal of reunification concurrent with adoption and ordered the goal be changed to adoption. Mother's Brief, at 12. Mother argues the record failed to support a conclusion that it was in the best interest of the Children to change the goal to adoption. Id. at 13.

Specifically, Mother contends that she was following her treatment plan, participating in services and working towards alleviating the circumstances that led to the placement of the Children. Mother also asserts that she was seeking help from services outside of the court-ordered services. Mother claims that she was finding success and support in those outside services. Mother stresses that the trial court acknowledged that she loves the Children, and urges that the trial court, thus, found that she has a bond with them.

Further, Mother asserts that the trial court's basis for changing the goal to adoption was J.C.'s decline in mental health, but she posits that his decline was largely caused by his desire to be reunified with Mother and to return home. Mother complains that the service providers did not explore this cause for J.C.'s decline in mental health. Mother also complains that the service providers proposed a month-long suspension of visitation between Mother and J.C., despite the fact that J.C. had consistently been visiting with Mother for

six weeks in a row, and despite noting that inconsistent visitation with Mother has a detrimental effect on J.C.

Additionally, Mother urges that she was compliant with her services, regularly participating in mental health and drug and alcohol counseling; providing clean urine tests; complying with the terms of her probation; and participating in services for both of the Children. Moreover, Mother states that she acknowledged and was forthcoming in the areas where she had not been fully compliant; it was consistently reported that she was willing to work with her service providers; and she was not resistant to constructive criticism or change.

Lastly, Mother contends that as the trial court recognized the existence of a bond between her and the Children, it is incomprehensible how the court could have determined that it was in the Children's best interests to find that a permanent severance of that bond would best suit their needs. Mother's Brief, at 15-16. Mother requests us to reverse the trial court's orders, and remand the matter to the trial court. Id. at 17.

The trial court addressed Mother's issue as follows.

> When considering a change of the child's permanent placement goal, "the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." In re M.T, 101 A.3d 1163, 1173 (Pa. Super. 2014) (citing In re A.K., 936 A.2d 528, 532-533 (Pa. Super. 2007)). "The burden is on the Agency to prove the change in goal would be in the child's best interests." Id. (citing In the Interest of M.B., 674 A.2d 702, 704 (Pa. Super. 1996).

- 23 -

It is well-settled that "[i]f reunification with the child's parent is not in a child's best interest, the court may determine that [a]doption is the appropriate permanency goal." Interest of H.J., [206 A.3d 22, 25 (Pa. Super. 2019)]; see also, 42 Pa.C.S.A. § 6351(f 1)(2). The Superior Court of Pennsylvania has held that once reasonable efforts have been made to return a child to a parent but those efforts have failed, ". . . the agency must redirect its efforts towards placing the child in an adoptive home." Interest of H.J., 206 A.3d at 25. The placement process ". . . should be completed within 18 months." Id. "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." Id. at 25 (citing In re Adoption of M.E.P., 825 A.2d 1266, 1276 (Pa. Super. 2003)).

B. This Court's change of goal to adoption is in J.C. and J.W.'s best interests and is supported by the record.

Initially, the [trial court] notes that [Mother] has not challenged the initial removal of the [C]hildren by Emergency Protective Order pursuant to 42 Pa.C.S.A. § 6324(1). [Mother] also does not challenge and, in fact, stipulated to, Adjudication of the [C]hildren [as dependent] pursuant to 42 Pa.C.S.A. § 6341(a), (c). [Mother] did not challenge the [trial court's] prior determination on October 21, 2019, changing the goal to concurrent return to parent/adoption. See 42 Pa.C.S.A. § 6351(f.1), (g). Therefore, the only challenge in the appeals sub judice is whether [the trial court] erred in its determination on January 21, 2020, to change the goal to adoption. As will be demonstrated, [Mother's] claim is without merit and warrants dismissal.

Cognizant of the above statutory mandates and case law, [the trial court] considered all of the evidence in making its determination that changing the permanency placement goals of J.C. and J.W. to adoption was the disposition "best suited to the safety, protection and physical, mental and moral welfare of the child[ren]." 42 Pa.C.S.A. § 6351(f.1), (g).

Prior to making its determination to change the permanency goal to adoption, [the trial court] considered the relevant factors listed at 42 Pa.C.S.A. § 6351(f). First, the [trial court] found that the placement of the [C]hildren continues to be necessary and appropriate and reasonable efforts have been

made by OCY to finalize the [C]hildren's permanency plans. (See Permanency Review Orders, 1/15/2020 at 1). J.C. is receiving necessary mental health treatment in his current placement, and OCY is seeking a therapeutic foster home to best suit J.C.'s continuing needs. N.T. at 19. J.W. is placed in a pre[-]adoptive foster home that meets all of her needs and is thriving. Id. at 25.

Next, the [trial court] found that [Mother] has been only minimally compliant with the permanency plan, and has made minimal progress toward alleviating the circumstances which necessitated the [C]hildren's original placement. (See Permanency Review Orders, 1/15/2020 at 1). Specifically, there are ongoing concerns with [Mother's] mental health (including bipolar disorder, post-traumatic stress disorder, anxiety disorder, et al.), drug history, unstable housing, and parenting skills, including her ability to keep the [C]hildren safe.

[Mother's] mental health treatment has been somewhat unpredictable, evidenced by missed appointments and reports she is inconsistent with her medication. N.T. at 20; 23-25. Further, [Mother] was discharged from Justice Works, a program intended to help her with parenting skills. The discharge was due to [Mother's] non-compliance, lack of attendance, and failure to progress. Moreover, [Mother] has been inconsistent with visitations with the [C]hildren[,] and this inconsistency causes the [C]hildren to have anxiety and negative reactions. Id at 20-22. [Mother] has not participated in J.C.'s therapy or mental health treatment. Id. at 40-41. [Mother] has not participated in J.W.'s speech therapy or work[ed] with Early Intervention. Id. at 48. By all accounts, [Mother] has not made any progress in reunifying with the [C]hildren. Id. at 56.

There are continued concerns about [Mother's] ability to keep the [C]hildren safe, as illustrated by her living situation with a known sexual predator and an individual who has had rights involuntarily terminated to three of his own children. Id. at 22-23; 38; 45. Although [Mother] stated she would move, she has not because in reality she has no money to do so and fails to recognize that the situation is unsafe for the children. Id. at 44[,] 47.

Consequently, the circumstances which necessitated the placement of the [C]hildren including: [Mother's] ability to safely parent the [C]hildren; her unstable housing; and [sic] concerns

about her mental health; and concerns about her drug and alcohol use, have not been alleviated. [Mother] remains in virtually the same position as she was over a year ago, in December 2018, when J.C. and J.W. were first removed and adjudicated dependent. [Mother] has had more than a year to demonstrate compliance with the treatment plan but has failed to do so. OCY officially filed a Motion for Change of Placement on December 20, 2019 providing notice to [Mother] that a goal change would be at issue at the hearing the following month, yet [Mother] made no further efforts to comply with the court-ordered treatment plan[,] and made no attempt to remedy the circumstances that justified the adjudication of dependency.

The collective evidence presented indicates the [C]hildren are in desperate need of permanency and stability. Id. at 25; 34. Most impacted is J.C., who has been in placement for a total of 18 months since his first adjudication in 2017. J.C. suffers from significant mental health diagnoses, including Reactive Attachment Disorder, Post-Traumatic Stress Disorder, Attention Deficit/Hyperactive Disorder, Disruptive Mood Dysregulation Disorder, and learning disorders, and therefore needs special therapeutic treatment. Id. at 22; (see also, Court Summaries, 7/24/2017; 4/8/2019; 10/21/2019; and 1/15/2020). After receiving the testimony and evidence, the [trial court] addressed the severity of the situation with J.C., stating:

> THE COURT: Her good intentions aside, the reality is, we're arguably a year and a half in with [J.C.] and I feel for him. I did meet with him briefly. He was, I guess, somewhat verbal . . . this has had an impact on him. I think he is, and he will speak, but this has had a grave impact on him, no matter how you look at it, no matter whether you believe mom or don't, but think -- but the poor kid at what, 8, he's in a shelter. And he needs a therapeutic home because of his severe mental health.

Id. at 53.

The [trial court] found J.W.'s circumstance to be neutral at best. J.W. has been in placement for 13 months. J.W. has established a bond with her foster parents and they are all she has known as caretakers for the majority of her life.

In consideration of the evidence and testimony presented, the [trial court] found OCY had met its burden in demonstrating that a goal change to adoption is in the [C]hildren's best interest. Currently, both children are in the most stable environment available. The [C]hildren's mental health, physical, educational, and emotional needs are being treated and met. [Mother] has failed to "alleviate the circumstances which necessitated the original placement" and has demonstrated, at most, minimal compliance with treatment plans designed to effectuate reunification.

Based on all of these factors, the [trial court] found the permanency goal of return to parent concurrent with adoption was no longer appropriate or feasible and clearly is not in the [C]hildren's best interests. The [C]hildren simply cannot wait for [Mother] to decide to comply with the treatment plans or "summon the ability to handle the responsibilities of parenting." See Interest of H.J., 206 A.3d at 25. Consequently, the change of goals to adoption is in both children's best interests, and adoption is "best suited to the [C]hildren's safety, protection, and physical and moral welfare." 42 Pa.C.S.A. § 6351(f.1), (g); see also, In re N.C., [909 A.2d 818, 823 (Pa. Super. 2006)]; In re M.T., 101 A.3d at 1177; Interest of H.J., 206 A.3d at 25-27.

Therefore, [Mother's] challenges to [the trial court's] determination to change the goals to adoption are without merit.

Trial Court Opinion, 3/17/20, at 20-24.

After our careful review of the record in this matter, we find that the competent evidence in the record supports the trial court's credibility and weight assessments. Thus, we will not disturb them. Moreover, we find the trial court orders are supported by clear and convincing evidence, and we do not perceive any abuse of discretion or error of law on the part of the trial court. See Interest of H.J., 206 A.3d 22, 25 (Pa. Super. 2019); In Interest of: L.Z., A Minor Child, 641 Pa. at 360, 111 A.3d at 1174. We, therefore,

affirm the goal change orders based on the discussion provided in the trial court opinion dated March 17, 2020.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/19/2020